**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lucille A. Federico,<br><br>        Plaintiff,<br><br>v.<br><br>Patrick R. Donahoe, Postmaster General,<br><br>        Defendant. | No. CV-11-1952-PHX-GMS<br><br>**ORDER** |

Defendant Patrick Donahoe, sued in his official capacity as Postmaster General of the United States, has moved for summary judgment on Plaintiff Lucille Federico's claims. (Doc. 42.) For the reasons discussed below, the Court grants the Motion.

**FACTUAL BACKGROUND**

Federico claims that her employer, the US Postal Service, subjected her to disparate treatment, retaliation, a hostile work environment, and failed to accommodate her disability. Federico began working for the Postal Service almost 30 years ago. (Doc. 43 ¶ 1; Doc. 48 at I.) During that time, she has performed a range of work for the Postal Service, and the Postal Service has altered her responsibilities in the past as she has encountered health problems. (Doc. 43 ¶¶ 1–3; Doc. 48 at I.)

In January 2010, Federico began a new assignment in the General Mail Facility in Phoenix, Arizona. (Doc. 43 ¶¶ 4–8; Doc. 46 ¶¶ 13–14, 19–20.) That assignment was based on a December 2009 Offer of Modified Assignment that Federico received following the elimination of her previous job. (Doc. 43 ¶ 4; Doc. 46-4, Ex. 4.) Her duties

were mostly of the mail sorting variety, and she worked at her own pace. (Doc. 43 ¶¶ 7–8; Doc. 48 at I.)

Federico had taken her offer of employment to her physician, Dr. Leonard Bodell. (Doc. 43 ¶ 10; Doc. 46 ¶ 15.) He completed a Work Capacity Evaluation form and authored a letter to the Postal Service concluding that her present duties were likely aggravating her wrist and shoulder problems. (Doc. 43-9, Ex. 9 at 3.)

Federico presented the letter to her supervisors. After supervisors reviewed Dr. Bodell's letter on January 25 or 26, 2010, they determined that no work currently existed for Federico to perform and sent her home for the day. (Doc. 43 ¶ 11; Doc. 46 ¶ 21.) Her supervisors did not provide a return date or an alternative job. (Doc. 43-2, Ex. 1 (Federico Dep.) at 47:22–23.) Upon reflection, one of those supervisors, James Brennamen, does not believe that Federico should have been sent home. (Doc. 43-8, Ex. 7 (Brennamen Dep.) at 10:11–25.) Other supervisors shared that opinion.

Two or three days after Federico was sent home, a meeting took place between Federico and Linda Hartshorn, the Postal Service's Human Resources Manager in Phoenix. (Doc. 43 ¶ 12; Doc. 46 ¶ 16.) At the meeting, Hartshorn reviewed Federico's current job duties contained in the December 2009 Offer of Modified Assignment. (Doc. 43 ¶ 14; Doc. 46 ¶ 16.) Federico and her husband, who was in attendance, stated that their concern was the effect the casing of mail had on Federico's medical conditions. (Doc. 43-2, Ex. 1 (Federico Dep.) at 58:14–23.) Hartshorn made a series of marks on the December 2009 offer and accompanying description of job duties that excised references to casing letters and hand sorting various classifications of mail. (Doc. 43-2, Ex. 1 at "Ex. 2.") Hartshorn believed that she had crossed out all references to casing in the Offer. (Doc. 42 ¶ 18; Doc. 48 at I.) Those markings were initialed by Hartshorn and Federico. (Doc. 43 ¶ 16; Doc. 46 ¶ 16.) The Parties dispute the remaining contents of the 90-minute discussion, but there is no evidence that Federico requested any additional modifications to the job offer at that meeting. (Doc. 43-2, Ex. 1 (Federico Dep.) at 65:1–8.)

Federico then took the modified job offer to her physicians to receive their input.

(Doc. 42 ¶ 22; Doc. 48 at I.) She met with her shoulder specialist, Dr. Dana Seltzer, on February 5, 2010, and came away from that meeting with the understanding that her limitations would remain the same as they had been. (*Id.*) Federico waited six weeks for the dictation of her appointment with Dr. Seltzer. (*Id.*) Federico was not working for the Postal Service during this time. While she was waiting for the dictation, she received a letter from Kathy Hinojos, a Health and Resource Management Specialist, that advised Federico the modified job was still available. (Doc. 42 ¶ 23; Doc. 48 at I.) Hinojos asked Federico to let her know if she accepted or rejected the job by February 12, 2010. (*Id.*) Federico wrote Hartshorn the next day and expressed her willingness to "continue to work if the postal service can provide work for me that is acceptable with my physicians and is within my limitations/restrictions." (Doc. 43-2, Ex. 1 at "Ex. 8.") Federico then responded to Hinojos's letter by asking for more time to receive and review her physician's dictations before responding to the job offer. (*Id.* at "Ex. 9.") She expressed her willingness to accept a new job so long as her doctor approved the restrictions. (*Id.*) Federico wrote another letter to Hinojos in March 2010. (Doc. 42 ¶ 27; Doc. 48 at I.) She informed Hinojos that she was still waiting for her doctor's dictations. (*Id.*) Federico raised an additional issue: she expressed confusion at the duties of the current offer because Hartshorn had crossed out "Hand sorts various classifications of mail in all manual operations," but had not crossed out a sentence that appeared later in the paragraph: "Hand sort mail into L-shaped case for delivery to substations." (*Id.*)

Dr. Seltzer sent a letter to the Postal Service on April 24, 2010. (Doc. 46-8, Ex. 8.) Dr. Seltzer reported "no additional problems" and an "unchanged" diagnosis from previous visits. (*Id.*) The letter also relayed Dr. Seltzer's "belie[f] that Ms. Federico can perform the tasks of a maintenance support clerk as described in the job duties description that I received, though she will have some difficulty even with rare use of her arm at or above shoulder level." (*Id.*) He had "told Ms. Federico that I believe she can perform this job as described." (*Id.*)

After receiving the letter, Hinojos followed up with Federico. (Doc. 42 ¶ 29; Doc.

48 at I.) She forwarded Dr. Seltzer's letter and reaffirmed to Federico that the modified job was available. (*Id.*) Federico responded by again citing the discrepancy between certain eliminated and remaining provisions in the offer relating to casing and requested clarification. (Doc. 43-2, Ex. 1 at "Ex. 12.")

At this same time, Federico was seeking compensation from the Department of Labor ("DOL") for the time she was missing. (Doc. 42 ¶ 26; Doc. 48 at I.) While that request was pending, Federico was assigned to a new supervisor, Steve Kvochko. (Doc. 42 ¶ 31; Doc. 48 at I.) Kvochko was in contact with Federico, but Federico stated that she was not reporting to work because she was waiting for a decision on her claim for wage compensation from the DOL. (Doc. 42 ¶ 33; Doc. 48 at I.)

Her claim for compensation was denied by the DOL on July 21, 2010, and Hinojos and Kvochko both contacted Federico and told her that she needed to return to work. (Doc. 42 ¶¶ 34–35; Doc. 48 at I.) Federico, however, informed them that she intended to appeal the denial and would not yet return to work. (Doc. 42 ¶¶ 35–36; Doc. 48 at I.) Once the DOL denied Federico's request for compensation for the time she missed for the first half of 2010, Kvochko kept Federico in a Leave Without Pay (LWOP) status. (Doc. 43-3, Ex. 2 (Kvochko Dep.) at 75:8–24.) After some period of time, Federico had still not stated whether and when she intended to return to work, and Kvochko decided to hold a "Fact-Finding" with her. (*Id.* at 76:22–77:7.) A Fact-Finding is often a precursor to formal discipline. (Doc. 43-7, Ex. 6 (Allen Dep.) at 38:5–7.)

Kvochko held the Fact-Finding on September 3, 2010, and informed Federico that she was now designated Absent Without Leave (AWOL). (Doc. 42 ¶ 50; Doc. 48 at I.) An AWOL designation did not carry any specific disciplinary action or penalty; it served only to inform the employee that her absence was considered serious and that she should be reporting to work. (Doc. 42 ¶ 51; Doc. 48 at I.) In addition to, but separate from, the AWOL designation, Federico received a letter of warning for failure to be in regular attendance in February 2011. (Doc. 42 ¶ 53; Doc. 48 at I.) The letter followed another Fact-Finding. (Doc. 43-2, Ex. 1 (Federico Dep.) at 87:4–16.)

Kvochko raised the possibility that Federico might meet with the District Reasonable Accommodation Committee (DRAC) in the hopes that Federico might return to work in some capacity during the pendency of the appeal. (Doc. 42 ¶ 37; Doc. 48 at I.) Federico had reservations about the effectiveness of DRAC, but she was referred anyway. (Doc. 42 ¶¶ 37–39; Doc. 48 at I.) In the words of Human Resources Manager Lerene Wiley, DRAC exists to "consider reasonable accommodation for employees who have disabilities under the ADA." (Doc. 43-5, Ex. 4 (Wiley Dep.) at 7:4–7.)

The DRAC meeting initially was scheduled for October 2010, but was adjourned to allow Federico to submit necessary medical documentation. (Doc. 43-2, Ex. 1 (Federico Dep.) at 97:11–99:1.) The DRAC meeting was eventually rescheduled for March 17, 2011. (Doc. 42 ¶¶ 40–41; Doc. 46 ¶ 17.) During the meeting, the Committee discussed with Federico the pending job offer and Federico's concerns about limitations relating to "repetitive, lower intensity, . . . reaching above the shoulder." (Doc. 42 ¶¶ 41–42; Doc. 48 at I.)

The Parties disagree on whether any additional modifications were made to the pending job offer at the March 2011 DRAC meeting. Wiley, who was part of the DRAC meeting, testified at her deposition that "there were no modifications to the job made by the DRAC. . . . Accommodations identified . . . were, to me, already apparent in the job itself." (Doc. 43-5, Ex. 4 (Wiley Dep.) at 26:23–27:6.) Federico, on the other hand, testified that "[t]hey further modified the job" to be "self-paced with—in PARS [Postal Automated Return System]/Waste." (Doc. 43-2, Ex. 1 (Federico Dep.) at 100:10–14, 101:23–25.) Various parties described the meeting as resolving an impasse. The modified January 2010 Offer listed three duties: PARS waste mail, main office box section, and manuals 030. (Doc. 43-2, Ex. 1 at "Ex. 2.") Hartshorn believed that "they would be using [Federico] primarily in PARS/Waste . . . ." (Doc. 43-4, Ex. 3 (Harsthorn Dep.) at 66:13–23.) Hartshorn also testified that she previously explained to Federico that the job would be self-paced, although that portion of the job offer was not expressly delineated in writing during the January 2010 modification. (*Id.* at 37:18–40:12.) Self-pacing,

- 5 -

however, is typical for employees in Federico's position, according to Kvochko. (Doc. 43-3, Ex. 2 (Kvochko Dep.) at 53:11–54:8.)

The DRAC meeting ended with Federico agreeing to return to work on March 21, 2011. (Doc. 42 ¶ 46; Doc. 46 ¶ 17.) The job duties and accommodations were memorialized in a letter from Wiley. (Doc. 46-5, Ex. 5.) According to the letter, the DRAC "determined that accommodations could be provided to allow you to perform the essential functions of your position. These accommodations include allowing another employee to lift the PARS mail trays and place them on the table for you. Additionally, you will be allowed to work at your own pace to ensure consistency with your medical limitations." (*Id.*)

Meanwhile, Federico had filed an EEO complaint on November 26, 2010, and alleged discrimination against her supervisors. (Doc. 43-6, Ex. 5 at "Ex. 5.") None of the supervisors who interacted with Federico were aware of her EEO activity when they took action relating to Federico. (Doc. 42 ¶¶ 57–61, Doc. 48 at I.) Federico currently works for the Postal Service. Kvochko removed the AWOL designation in March 2011. (Doc. 42 ¶ 52; Doc. 48 at I.) The letter of warning was removed from her record during the summer of 2011. (Doc. 42 ¶ 53; Doc. 48 at I.)

Federico complied with the statutory requirements and brought this suit on October 5, 2011. (Doc. 1.) She asserts four claims against the Postal Service: (1) Violation of the Rehabilitation Act of 1973 for disparate treatment and failure to accommodate; (2) Employment Discrimination in violation of Title VII of the Civil Rights Act of 1964; (3) Retaliation; and (4) Hostile Work Environment. (Doc. 1.) Defendants have moved for summary judgment.

## DISCUSSION

**I.    LEGAL STANDARD**

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a). Substantive law determines which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248). Thus, the nonmoving party must show that the genuine factual issues "'can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson*, 477 U.S. at 250).

Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, . . . [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) ("Issues of credibility, including questions of intent, should be left to the jury.") (citations omitted).

Furthermore, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); see also L.R.Civ. 1.10(l)(1) ("Any party opposing a motion for summary judgment must . . . set[ ] forth the specific facts, which the opposing party asserts, including those facts which establish a genuine issue of material fact precluding summary judgment in favor of the moving party."). If the nonmoving party's opposition fails to specifically cite to materials either in the court's record or not in the record, the court is not required to either search the entire record for evidence establishing a genuine issue of

material fact or obtain the missing materials. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028–29 (9th Cir. 2001); *Forsberg v. Pac. N.W. Bell Tel. Co.*, 840 F.2d 1409, 1417–18 (9th Cir. 1988).

## II.   ANALYSIS

### A.   Reasonable Accommodation

Federico claims that the Postal Service failed to reasonably accommodate her disability. The Rehabilitation Act of 1973 mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity . . . conducted by . . . the United States Postal Service." 29 U.S.C. § 794(a). Federal regulations elaborate: "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). Failure to reasonably accommodate a disability runs afoul of the federal anti-discrimination laws. *See Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1176 (9th Cir. 1998). While an employer does not have a duty to create a new job for the disabled employee, it "has a duty to reassign nonprobationary employees if they become unable to perform the essential functions of their jobs, unless the reassignment would cause the employer undue hardship." *Mengine v. Runyon*, 114 F.3d 415, 418 (3d Cir. 1997).

"[O]nce the need for accommodation has been established, there is a mandatory obligation to engage in an informal interactive process 'to clarify what the individual needs and identify the appropriate accommodation.'" *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002) (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1112 (9th Cir. 2000), *rev'd on other grounds sub nom. U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002)). The EEOC has described, and the Ninth Circuit endorsed, the general outlines of the informal interactive process:

> (1) Analyze the particular job involved and determine its purpose and essential functions;
> (2) Consult with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation;
> (3) In consultation with the individual to be accommodated, identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position; and
> (4) Consider the preference of the individual to be accommodated and select and implement the accommodation that is most appropriate for both the employee and the employer.

29 C.F.R. Pt. 1630, App. § 1630.9; *Barnett*, 228 F.3d at 1114. Where there was a breakdown in the accommodation process, "'courts should attempt to isolate the cause of the breakdown [in the interactive process] and then assign responsibility' so that '[l]iability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown.'" *Barnett*, 228 F.3d at 1115 (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135–37 (7th Cir. 1996)). A genuine dispute as to whether the employer engaged in the interactive process in good faith precludes summary judgment. *Id.* at 1116.

Federico claims that she was denied reasonable accommodation because the Postal Service did not adequately engage in the interactive accommodation process. The Postal Service does not dispute that Federico was disabled, qualified to perform the essential functions of her position, with or without reasonable accommodation, or that a reasonable accommodation was available—all of which form the foundation of a disability discrimination case. *See Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001). Indeed, a suitable accommodation was eventually found. Federico's claim therefore centers on a breakdown in the accommodation process. Federico claims that she was denied accommodation twice: first when her supervisors sent her home without providing an alternative assignment on January 26, 2010, and, second, when she was forced to wait 14 months before the Postal Service provided a comprehensive set of accommodations. Nevertheless, Federico has failed to show a genuine issue of material

fact as to whether the Postal Service failed to provide her accommodations. The uncontroverted evidence shows that Postal Service did participate in good faith in the accommodation process, and that any delay or breakdown in the accommodation process was attributable to Federico.

The claim that the Postal Service failed to accommodate her by sending her home on January 26, 2010, is contradicted by the Postal Service's scheduling of a meeting two to three days later to discuss Federico's medical restrictions. Once an employee notifies her employer of her disability and desire for accommodation, as Federico did on January 26 with her doctor's note, she triggers the need for the interactive process. *Vinson*, 288 F.3d at 1154. A meeting was quickly scheduled with Hartshorn, the Human Resources Manager. The discussion at that meeting centered on what duties Federico would be able to perform in light of her medical restrictions. On those undisputed facts, Federico cannot maintain that the Postal Service failed to engage in the accommodation process following her notice of January 26, 2010.

The undisputed evidence also shows that fault for the delay from January 26, 2010, when Federico notified her supervisors of her disability and need for accommodation, until March 11, 2011, when she accepted a modified job offer, does not lie with the Postal Service. The Postal Service initiated the process at the January meeting, where Hartshorn and Federico reviewed her current job and crossed off duties that were incompatible with Federico's injuries, including the casing duties. Federico did not request further modification; she asked for time to review the restrictions with her doctor. Then she asked for time to wait for her doctor's dictation. During this time, Postal Service employees were in contact with Federico about returning to work, thus maintaining the dialogue necessary to the accommodation process. When Federico's doctor wrote the Postal Service that the job was compatible with Federico's medical restrictions, the Postal Service again reached out to Federico. This time, Federico said that she wanted to wait out the DOL's decision on her entitlement to paid leave for the

time she was not working.[1] And then when the DOL issued its adverse decision, she wanted to wait for the appeal. None of these facts are disputed. It was finally her supervisor, Kvochko, who asked Federico if she wanted to hold a DRAC meeting to see if there was some kind of job she could do while she waited out the administrative process for her paid leave claim. Federico was reluctant to participate, but eventually agreed. The meeting was delayed while Federico obtained additional medical records.[2] And the meeting ultimately resulted in a job offer that Federico accepted.

The Parties dispute whether the DRAC job offer differed in substance from the offer that had been pending since January 2010. Indeed, there is evidence of some confusion over the markings made by Hartshorn relating to Federico's casing duties. But even if—viewing the evidence in the light most favorable to Federico—the Parties made some additional adjustments to Federico's duties at the March 2011 DRAC meeting, Federico has produced no evidence to show that the Postal Service did not act with good faith in the accommodation process. That the final accommodation agreement did not exist in written form until March 2011 does not mean that the Postal Service violated its duty to "to engage in an informal interactive process . . . ." *Vinson*, 288 F.3d at 1154. Federico does not allege that the Postal Service ultimately failed to accommodate her disability, just that there was an unreasonable delay in achieving that agreement. There is not genuine dispute of material fact as to the Postal Service's efforts in that regard. It consistently reached out to Federico during the 14-month period she was absent to invite her to come back to work. Each time, Federico insisted that she wanted to wait—first for her doctor (who approved the position) and then for the DOL administrative process for her request for leave. There is no evidence to ascribe those delays to some failure to

---

[1] While an early letter from Federico raises questions about the casing duties that had been eliminated at the January 2010 meeting, Federico did not press those issues in later letters. She instead relied only on the DOL proceeding.

[2] Federico claims that she already produced those records. There is no evidence that she made this claim at the DRAC meeting or otherwise brought that to the attention of the Postal Service.

- 11 -

engage in an accommodation process on the part of the Postal Service. Summary judgment is therefore appropriate for the Postal Service on Federico's reasonable accommodation claim.

### B.     Retaliation

Federico claims that the Postal Service retaliated against her in two ways. First, it sent her home on January 26, 2010, for requesting a reasonable accommodation.[3] Second, and also allegedly in reprisal for her request, it conducted a Fact-Finding, designated her AWOL, and issued a Letter of Warning in late 2010 and early 2011. Title VII prohibits employers from discriminating against an employee for "oppos[ing] any practice made an unlawful employment practice by this subchapter, or . . . ma[king] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Protected activity thus includes the filing of a charge or a complaint, or providing testimony regarding an employer's alleged unlawful practices, as well as engaging in other activity intended to "oppose[ ]" an employer's discriminatory practices. *Id.*

"To establish retaliation, the [plaintiff] . . . must prove that: (1) [she] engaged in a protected activity; (2) [she] suffered an adverse employment decision; and (3) there was a causal link between [her] activity and the adverse employment decision." *E.E.O.C. v. Luce, Forward, Hamilton & Scripps*, 303 F.3d 994, 1004–05 (9th Cir. 2002). Part of this prima facie case is making a "showing sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had engaged in protected activity." *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003). If a plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for its actions. *See Porter v. Cal. Dep't of Corr.*, 419

---

[3] To the extent Federico claims that the Postal Service's actions at the January 2010 meeting with Hartshorn constituted adverse actions because she "was again provided no specific return to work date or path (process) for obtaining resolution of ther need for a position within her limitations," (Doc. 47 at 13), the uncontroverted evidence is that the delay was due to Federico's request to consult her doctor and decision to wait out her DOL proceeding.

- 12 -

F.3d 885, 894 (9th Cir. 2005). If the employer does so, the plaintiff must submit evidence indicating that the employers "proffered reason is merely a pretext for a retaliatory motive." *Id.*

The Postal Service does not dispute that Federico engaged in a protected activity and suffered an adverse employment decision. It disputes the causal connection. As to the January 26, 2010, encounter where supervisors sent Federico home, the very close relationship in time to the request for accommodation and the adverse action gives rise to an inferred causal connection. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) ("We have recognized previously that, in some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity. But timing alone will not show causation in all cases; rather, in order to support an inference of retaliatory motive, the termination must have occurred fairly soon after the employee's protected expression." (internal citations and quotation marks omitted)). Federico has thus made out a prima facie case of retaliation for the Postal Service's actions on January 26, 2010.

The Postal Service, however, has proffered a legitimate, nondiscriminatory reason for its actions. It claims that supervisors sent Federico home because there was no work currently available for Federico that fit her medical restrictions. At this stage, the Court looks at the employer's evidence as true. *See Bodett v. CoxCom, Inc.*, 366 F.3d 736, 744 (9th Cir. 2004) (citing *St. Mary's Honor Ctr. V. Hicks*, 509 U.S. 502, 509 (1993)). The unavailability of work perform qualifies as a legitimate, nonretaliatory reason for the adverse employment action of sending Federico home.

The burden now shifts to Federico to produce specific evidence showing that the Postal Service's proffered reason was pretextual. Federico makes no such argument in her Response.[4] It is her burden on summary judgment to set forth specific evidence that

---

[4] In fact, the portion of her Response that discusses the retaliation claim includes a footnote that appears to be a copy-and-paste from some other case, given that it references unknown parties and alcohol consumption as a cause for certain conduct. (Doc. 47 at 15 n.7.) She also claims that she has carried her burden in "two ways" and

could show pretext and she has not.

Federico's second basis for her retaliation claim is that the Fact-Finding, AWOL designation, and Letter of Warning were intended as reprisals for her request for accommodation. Federico can no longer rest on the temporal proximity of the protected conduct and the adverse employment action. The Ninth Circuit has not inferred causation when months have elapsed. *See Villiarimo*, 281 F.3d at 1065 (citing cases where four, five, eight, 12, and 18 months were "simply too long, by [them]sel[ves], to give rise to an inference of causation"). Nevertheless, Federico's supervisors stated that the adverse actions were taken due to her long absence from work, and that may serve as at least prima facie evidence that her supervisors were motivated by her previous request for accommodation.

The Postal Service has furnished a legitimate, non-discriminatory reason for the adverse employment actions: Federico had not returned to work despite numerous requests, and despite issuance of a note from her doctor that the modified job was ok, and the DOL's denial of her request, both of which were Federico's stated preconditions to returning to work. Failure to timely report to work is a legitimate basis for instituting the discipline here. Federico's protestations that she was dissatisfied with the pending offer of employment do not find support in the record. The Postal Service had communicated with Federico on several occasions and invited her to return to work, but Federico cited the need to wait for her doctor or the outcome of the DOL proceeding as justifications for her absence. She has not cited any evidence in the record where she effectively communicated her dissatisfaction with the offer.[5] As above, Federico has not produced evidence that the Postal Service's proffered reason for the adverse action was pretextual.

To the extent the retaliation claim rests on Federico's filing of an EEO complaint,

---

then only discusses one. (*Id.* at 14.)

[5] To the extent Federico relies on the fact that a mention of casing remained in the job offer that Hartshorn altered, there is no evidence that she engaged in an appropriate dialogue with the Postal Service to explore that concern. Instead, she consistently cited her doctor or the need to wait for her DOL proceeding.

- 14 -

the claim also fails. Even assuming that Federico has otherwise established the elements of a prima facie case, she has failed to produce any evidence "from which a reasonable trier of fact could conclude that [the supervisors who instituted these measures] were aware that she had engaged in protected activity." *Raad*, 323 F.3d at 1197. The individuals who made those decisions all testified at their depositions that they were unaware of Federico's EEO action. Federico has produced no evidence that would undermine those claims. Therefore, summary judgment is appropriate on her retaliation claim.

### C.     Disparate Treatment

Federico has also claimed that the Postal Service subjected her to disparate treatment based on her race, national origin, and disabled status. The Postal Service has moved for summary judgment on this count and Federico has not opposed. *See* L.R. Civ. 7.2(i) ("If . . . counsel does not serve and file the required answering memoranda . . . , such non-compliance may be deemed a consent to the denial or granting of the motion and the Court may dispose of the motion summarily."). And, indeed, there is no evidence in the record that Federico's race, national origin, or disabled status played any role in the adverse employment decision at issue or that similarly situated individuals outside of Federico's race, national origin, or disabled class were treated more favorably. *See Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (setting forth elements of disparate treatment claim). Moreover, as discussed above, even if Federico's disabled status played some role in the initial decision to send her home on January 26, 2010, the Postal Service has articulated a legitimate, nondiscriminatory reason for that action, namely, that no work was available. Summary judgment is therefore appropriate on the disparate treatment claim as well.

### D.     Hostile Work Environment

Federico claims that she was subjected to a hostile work environment because "the denial of all pay and benefits for a 14 month period . . . is sufficient to materially alter one's working environment while at the same time denying for the entire period the

accommodations needed that were readily available . . . ." (Doc. 47 at 16.) It is true that under Title VII it is unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of his race, color, religion, sex, national origin, or, presumably, disability. *See* 42 U.S.C. § 2000e-2(a)(1). But to prevail on such a claim, the plaintiff must show "(1) that [s]he was subjected to verbal or physical conduct of a [discriminatory] nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003). And "[t]he working environment must both subjectively and objectively be perceived as abusive." *Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1055 (9th Cir. 2007) (internal quotation marks omitted).

Federico has produced no evidence of any conduct that would establish a hostile work environment under Title VII. She has not produced any direct or circumstantial evidence of animus. She has not shown discriminatory verbal or physical conduct while at work. Indeed, her claim covers a large period of time where she was not at work, largely because she was waiting for doctors and administrative appeals, not because her workplace was hostile. Her hostile work environment claim mimics her other claims in the lawsuit, but those allegations do not go to a claim for a hostile work environment. In the absence of any evidence that fits the elements of a hostile work environment claim, summary judgment must be granted on that count.

## CONCLUSION

There exists no genuine dispute of material fact that goes to any of Federico's claims in this matter. The uncontroverted evidence is that the Postal Service sought to reasonably accommodate Federico's limitations, and did not engage in retaliation, discrimination, or create a hostile work environment.

/ / /

/ / /

**IT IS THEREFORE ORDERED** that the Postal Service's Motion for Summary Judgment (Doc. 42) is **GRANTED.** The Clerk of Court is directed to entered judgment for the Postal Service. Federico shall take nothing.

Dated this 2nd day of August, 2013.

_____
/G. Murray Snow
United States District Judge